(Slip Opinion)	OCTOBER TERM, 2007	1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MORGAN STANLEY CAPITAL GROUP INC. *v.* PUBLIC UTILITY DISTRICT NO. 1 OF SNOHOMISH COUNTY ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 06–1457.	Argued February 19, 2008—Decided June 26, 2008*

Under the *Mobile-Sierra* doctrine, the Federal Energy Regulatory Commission (FERC) must presume that the electricity rate set in a freely negotiated wholesale-energy contract meets the "just and reasonable" requirement of the Federal Power Act (FPA), see 16 U. S. C. §824d(a), and the presumption may be overcome only if FERC concludes that the contract seriously harms the public interest. See *United Gas Pipe Line Co.* v. *Mobile Gas Service Corp.,* 350 U. S. 332; *FPC* v. *Sierra Pacific Power Co.,* 350 U. S. 348. Under FERC's current regulatory regime, a wholesale electricity seller may file a "market-based" tariff, which simply states that the utility will enter into freely negotiated contracts with purchasers. Those contracts are not filed with FERC before they go into effect. In 2000 and 2001, there was a dramatic increase in the price of electricity in the western United States. As a result, respondents entered into long-term contracts with petitioners that locked in rates that were very high by historical standards. Respondents subsequently asked FERC to modify the contracts, contending that the rates should not be presumed just and reasonable under *Mobile-Sierra.* The Administrative Law Judge concluded that the presumption applied and that the contracts did not seriously harm the public interest. FERC affirmed, but the Ninth Circuit remanded. The court held that contract rates are pre-

———

*Together with No. 06–1462, *American Electric Power Service Corp. et al.* v. *Public Utility District No. 1 of Snohomish County et al.,* also on certiorari to the same court.

sumptively reasonable only where FERC has had an initial opportunity to review the contracts without applying the *Mobile-Sierra* presumption and therefore that the presumption should not apply to contracts entered into under "market-based" tariffs. The court alternatively held that there is a different standard for overcoming the *Mobile-Sierra* presumption when a *purchaser* challenges a contract: whether the contract exceeds a "zone of reasonableness."

*Held:*

1. The Commission was required to apply the *Mobile-Sierra* presumption in evaluating the contracts here. *Sierra* held that a rate set out in a contract must be presumed to be just and reasonable absent serious harm to the public interest, regardless of when the contract is challenged. *FPC* v. *Texaco Inc.*, 417 U. S. 380, distinguished. Also, the Ninth Circuit's rule requiring FERC to ask whether a contract was formed in an environment of market "dysfunction" is not supported by this Court's cases and plainly undermines the role of contracts in the FPA's statutory scheme. Pp. 15–19.

2. The Ninth Circuit's "zone of reasonableness" test fails to accord an adequate level of protection to contracts. The standard for a buyer's rate-increase challenge must be the same, generally, as the standard for a seller's challenge: The contract rate must seriously harm the public interest. The Ninth Circuit misread *Sierra* in holding that the standard for evaluating a high-rate challenge and setting aside a contract rate is whether consumers' electricity bills were higher than they would have been had the contract rates equaled "marginal cost." Under the *Mobile-Sierra* presumption*,* setting aside a contract rate requires a finding of "unequivocal public necessity," *Permian Basin Area Rate Cases*, 390 U. S. 747, 822, or "extraordinary circumstances," *Arkansas Louisiana Gas Co.* v. *Hall*, 453 U. S. 571, 582. Pp. 19–23.

3. The judgment below is nonetheless affirmed on alternative grounds, based on two defects in FERC's analysis. First, the analysis was flawed or incomplete to the extent FERC looked simply to whether consumers' rates increased immediately upon conclusion of the relevant contracts, rather than determining whether the contracts imposed an excessive burden "down the line," relative to the rates consumers could have obtained (but for the contracts) after elimination of the dysfunctional market. *Sierra*'s "excessive burden" on customers was the current burden, not just the burden imposed at the contract's outset. See 350 U. S., at 355. Second, it is unclear from FERC's orders whether it found respondents' evidence inadequate to support their claim that petitioners engaged in unlawful market manipulation that altered the playing field for contract negotiations. In such a case, the Commission should not presume that a

Syllabus

contract is just and reasonable. Like fraud and duress, unlawful market activity directly affecting contract negotiations eliminates the premise on which the *Mobile-Sierra* presumption rests: that the contract rates are the product of fair, arms-length negotiations. On remand, FERC should amplify or clarify its findings on these two points. Pp. 23–26.

471 F. 3d 1053, affirmed and remanded.

SCALIA, J., delivered the opinion of the Court, in which KENNEDY, THOMAS, and ALITO, JJ., joined, and in which GINSBURG, J., joined as to Part III. GINSBURG, J., filed an opinion concurring in part and concurring in the judgment. STEVENS, J., filed a dissenting opinion, in which SOUTER, J., joined. ROBERTS, C. J., and BREYER, J., took no part in the consideration or decision of the cases.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 06–1457 and 06–1462

————

### MORGAN STANLEY CAPITAL GROUP INC., PETITIONER

06–1457                    *v.*

### PUBLIC UTILITY DISTRICT NO. 1 OF SNOHOMISH COUNTY, WASHINGTON, ET AL.

### AMERICAN ELECTRIC POWER SERVICE CORPORATION, ET AL., PETITIONERS

06–1462                    *v.*

### PUBLIC UTILITY DISTRICT NO. 1 OF SNOHOMISH COUNTY, WASHINGTON, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 26, 2008]

JUSTICE SCALIA delivered the opinion of the Court.

Under the *Mobile-Sierra* doctrine, the Federal Energy Regulatory Commission (FERC or Commission) must presume that the rate set out in a freely negotiated wholesale-energy contract meets the "just and reasonable" requirement imposed by law. The presumption may be overcome only if FERC concludes that the contract seriously harms the public interest. These cases present two questions about the scope of the *Mobile-Sierra* doctrine: First, does the presumption apply only when FERC has had an initial opportunity to review a contract rate without the presumption? Second, does the presumption im-

2    MORGAN STANLEY CAPITAL GROUP INC. *v.* PUBLIC
UTIL. DIST. NO. 1 OF SNOHOMISH CTY.

Opinion of the Court

pose as high a bar to challenges by purchasers of whole-
sale electricity as it does to challenges by sellers?

## I

## A

### Statutory Background

The Federal Power Act (FPA), 41 Stat. 1063, as
amended, gives the Commission[1] the authority to regulate
the sale of electricity in interstate commerce—a market
historically characterized by natural monopoly and there-
fore subject to abuses of market power. See 16 U. S. C.
§824 *et seq.* Modeled on the Interstate Commerce Act, the
FPA requires regulated utilities to file compilations of
their rate schedules, or "tariffs," with the Commission,
and to provide service to electricity purchasers on the
terms and prices there set forth. §824d(c). Utilities wish-
ing to change their tariffs must notify the Commission 60
days before the change is to go into effect. §824d(d).
Unlike the Interstate Commerce Act, however, the FPA
also permits utilities to set rates with individual electric-
ity purchasers through bilateral contracts. §824d(c), (d).
As we have explained elsewhere, the FPA "departed from
the scheme of purely tariff-based regulation and acknowl-
edged that contracts between commercial buyers and
sellers could be used in ratesetting." *Verizon Communica-
tions Inc.* v. *FCC,* 535 U. S. 467, 479 (2002). Like tariffs,
contracts must be filed with the Commission before they
go into effect. 16 U. S. C. §824d(c), (d).

The FPA requires all wholesale-electricity rates to be
"just and reasonable." §824d(a). When a utility files a
new rate with the Commission, through a change to its
tariff or a new contract, the Commission may suspend the
rate for up to five months while it investigates whether

---

[1] We also use "Commission" to refer to the Federal Power Commis-
sion, FERC's predecessor.

the rate is just and reasonable. §824d(e). The Commission may, however, decline to investigate and permit the rate to go into effect—which does not amount to a determination that the rate is "just and reasonable." See 18 CFR §35.4 (2007). After a rate goes into effect, whether or not the Commission deemed it just and reasonable when filed, the Commission may conclude, in response to a complaint or on its own motion, that the rate is not just and reasonable and replace it with a lawful rate. 16 U. S. C. §824e(a) (2000 ed., Supp. V).

The statutory requirement that rates be "just and reasonable" is obviously incapable of precise judicial definition, and we afford great deference to the Commission in its rate decisions. See *FPC* v. *Texaco Inc.*, 417 U. S. 380, 389 (1974); *Permian Basin Area Rate Cases*, 390 U. S. 747, 767 (1968). We have repeatedly emphasized that the Commission is not bound to any one ratemaking formula. See *Mobil Oil Exploration & Producing Southeast, Inc.* v. *United Distribution Cos.*, 498 U. S. 211, 224 (1991); *Permian Basin*, *supra*, at 776–777. But FERC must choose a method that entails an appropriate "balancing of the investor and the consumer interests." *FPC* v. *Hope Natural Gas Co.*, 320 U. S. 591, 603 (1944). In exercising its broad discretion, the Commission traditionally reviewed and set tariff rates under the "cost-of-service" method, which ensures that a seller of electricity recovers its costs plus a rate of return sufficient to attract necessary capital. See J. McGrew, Federal Energy Regulatory Commission 152, 160–161 (2003) (hereinafter McGrew).

In two cases decided on the same day in 1956, we addressed the authority of the Commission to modify rates set bilaterally by contract rather than unilaterally by tariff. In *United Gas Pipe Line Co.* v. *Mobile Gas Service Corp.*, 350 U. S. 332, we rejected a natural-gas utility's argument that the Natural Gas Act's requirement that it file all new rates with the Commission authorized it to

4    MORGAN STANLEY CAPITAL GROUP INC. *v.* PUBLIC
UTIL. DIST. NO. 1 OF SNOHOMISH CTY.

Opinion of the Court

abrogate a lawful contract with a purchaser simply by filing a new tariff, see *id.*, at 336–337. The filing requirement, we explained, is merely a *precondition* to changing a rate, not an *authorization* to change rates in violation of a lawful contract (*i.e.*, a contract that sets a just and reasonable rate). See *id.*, at 339–344.

In *FPC* v. *Sierra Pacific Power Co.*, 350 U. S. 348, 352–353 (1956), we applied the holding of *Mobile* to the analogous provisions of the FPA, concluding that the complaining utility could not supersede a contract rate simply by filing a new tariff. In *Sierra*, however, the Commission had concluded not only (contrary to our holding) that the newly filed tariff superseded the contract, but also that the contract rate itself was not just and reasonable, "solely because it yield[ed] less than a fair return on the net invested capital" of the utility. *Id.*, at 355. Thus, we were confronted with the question of how the Commission may evaluate whether a contract rate is just and reasonable.

We answered that question in the following way:

> "[T]he Commission's conclusion appears on its face to be based on an erroneous standard. . . . [W]hile it may be that the Commission may not normally impose upon a public utility a rate which would produce less than a fair return, it does not follow that the public utility may not itself agree by contract to a rate affording less than a fair return or that, if it does so, it is entitled to be relieved of its improvident bargain. . . . In such circumstances the sole concern of the Commission would seem to be whether the rate is so low as to adversely affect the public interest—as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory." *Id.*, at 354–355 (emphasis deleted).

As we said in a later case, "[t]he regulatory system created

by the [FPA] is premised on contractual agreements voluntarily devised by the regulated companies; it contemplates abrogation of these agreements only in circumstances of unequivocal public necessity." *Permian Basin, supra,* at 822.

Over the past 50 years, decisions of this Court and the Courts of Appeals have refined the *Mobile-Sierra* presumption to allow greater freedom of contract. In *United Gas Pipe Line Co.* v. *Memphis Light, Gas and Water Div.*, 358 U. S. 103, 110–113 (1958), we held that parties could contract out of the *Mobile-Sierra* presumption by specifying in their contracts that a new rate filed with the Commission would supersede the contract rate. Courts of Appeals have held that contracting parties may also agree to a middle option between *Mobile-Sierra* and *Memphis Light:* A contract that does not allow the seller to supersede the contract rate by filing a new rate may nonetheless permit the Commission to set aside the contract rate if it results in an unfair rate of return, not just if it violates the public interest. See, *e.g.*, *Papago Tribal Util. Auth.* v. *FERC*, 723 F. 2d 950, 953 (CADC 1983); *Louisiana Power & Light Co.* v. *FERC*, 587 F. 2d 671, 675–676 (CA5 1979). Thus, as the *Mobile-Sierra* doctrine has developed, regulated parties have retained broad authority to specify whether FERC can review a contract rate solely for whether it violates the public interest or also for whether it results in an unfair rate of return. But the *Mobile-Sierra* presumption remains the default rule.

Moreover, even though the challenges in *Mobile* and *Sierra* were brought by sellers, lower courts have concluded that the *Mobile-Sierra* presumption also applies where a purchaser, rather than a seller, asks FERC to modify a contract. See *Potomac Elec. Power Co.* v. *FERC*, 210 F. 3d 403, 404–405, 409–410 (CADC 2000); *Boston Edison Co.* v. *FERC*, 856 F. 2d 361, 372 (CA1 1988). This Court has seemingly blessed that conclusion, explaining

6    MORGAN STANLEY CAPITAL GROUP INC. *v.* PUBLIC
UTIL. DIST. NO. 1 OF SNOHOMISH CTY.

Opinion of the Court

that under the FPA, "[w]hen commercial parties . . . avail themselves of rate agreements, the principal regulatory responsibility [is] not to relieve a contracting party of an unreasonable rate." *Verizon,* 535 U. S., at 479 (citing *Sierra, supra,* at 355).

Over the years, the Commission began to refer to the two modes of review—one with the *Mobile-Sierra* presumption and the other without—as the "public interest standard" and the "just and reasonable standard." See, *e.g.*, *Southern Co. Servs., Inc. Gulf States Utils. Co.* v. *Southern Co. Servs., Inc.*, 39 FERC ¶63,026, pp. 65,134, 65,141 (1987). Decisions from the Courts of Appeals did likewise. See, *e.g.*, *Kansas Cities* v. *FERC*, 723 F. 2d 82, 87–88 (CADC 1983); *Northeast Utils. Serv. Co.* v. *FERC*, 993 F. 2d 937, 961 (CA1 1993). We do not take this nomenclature to stand for the obviously indefensible proposition that a standard different from the statutory just-and-reasonable standard applies to contract rates. Rather, the term "public interest standard" refers to the differing *application* of that just-and-reasonable standard to contract rates. See *Philadelphia Elec. Co.*, 58 F. P. C. 88, 90 (1977). (It would be less confusing to adopt the Solicitor General's terminology, referring to the two differing applications of the just-and-reasonable standard as the "ordinary" "just and reasonable standard" and the "public interest standard." See Reply Brief for Respondent FERC 6.)

B

*Recent FERC Innovations; Market-Based Tariffs*

In recent decades, the Commission has undertaken an ambitious program of market-based reforms. Part of the impetus for those changes was technological evolution. Historically, electric utilities had been vertically integrated monopolies. For a particular geographic area, a single utility would control the generation of electricity, its transmission, and its distribution to consumers. See

*Midwest ISO Transmission Owners* v. *FERC*, 373 F. 3d 1361, 1363 (CADC 2004). Since the 1970's, however, engineering innovations have lowered the cost of generating electricity and transmitting it over long distances, enabling new entrants to challenge the regional generating monopolies of traditional utilities. See generally *New York* v. *FERC*, 535 U. S. 1, 7–8 (2002); *Public Util. Dist. No. 1 of Snohomish Cty.* v. *FERC*, 272 F. 3d 607, 610 (CADC 2001).

To take advantage of these changes, the Commission has attempted to break down regulatory and economic barriers that hinder a free market in wholesale electricity. It has sought to promote competition in those areas of the industry amenable to competition, such as the segment that generates electric power, while ensuring that the segment of the industry characterized by natural monopoly—namely, the transmission grid that conveys the generated electricity—cannot exert monopolistic influence over other areas. See *New York*, *supra*, at 9–10; *Snohomish*, *supra*. To that end, FERC required in Order No. 888 that each transmission provider offer transmission service to all customers on an equal basis by filing an "open access transmission tariff." Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities, 61 Fed. Reg. 21540 (1996); see *New York*, *supra*, at 10–12. That requirement prevents the utilities that own the grid from offering more favorable transmission terms to their own affiliates and thereby extending their monopoly power to other areas of the industry.

To further pry open the wholesale-electricity market and to reduce technical inefficiencies caused when different utilities operate different portions of the grid independently, the Commission has encouraged transmission providers to establish "Regional Transmission Organizations"—entities to which transmission providers would

8    MORGAN STANLEY CAPITAL GROUP INC. *v.* PUBLIC
UTIL. DIST. NO. 1 OF SNOHOMISH CTY.

Opinion of the Court

transfer operational control of their facilities for the purpose of efficient coordination.  Order No. 2000, 65 Fed. Reg. 810, 811–812 (2000); see *Midwest ISO, supra,* at 1364.  It has encouraged the management of those entities by "Independent System Operators," not-for-profit entities that operate transmission facilities in a nondiscriminatory manner.  See *Midwest ISO, supra.*  In addition to coordinating transmission service, Regional Transmission Organizations perform other functions, such as running auction markets for electricity sales and offering contracts for hedging against potential grid congestion.  See Blumsack, Measuring the Benefits and Costs of Regional Electric Grid Integration, 28 Energy L. J. 147, 147 (2007).

Against this backdrop of technological change and market-based reforms, the Commission over the past two decades has begun to permit sellers of wholesale electricity to file "market-based" tariffs.  These tariffs, instead of setting forth rate schedules or rate-fixing contracts, simply state that the seller will enter into freely negotiated contracts with purchasers.  See generally Market-Based Rates For Wholesale Sales Of Electric Energy, Capacity And Ancillary Services By Public Utilities, Order No. 697, 72 Fed. Reg. 39904 (2007) (hereinafter Market-Based Rates); McGrew 160–167.  FERC does not subject the contracts entered into under these tariffs (as it subjected traditional wholesale-power contracts) to §824d's requirement of immediate filing, apparently on the theory that the requirement has been satisfied by the initial filing of the market-based tariffs themselves.  See Brief for Respondent FERC 28–29 (hereinafter Brief for FERC).

FERC will grant approval of a market-based tariff only if a utility demonstrates that it lacks or has adequately mitigated market power, lacks the capacity to erect other barriers to entry, and has avoided giving preferences to its affiliates.  See Market-Based Rates, ¶7, 72 Fed. Reg. 39907. In addition to the initial authorization of a market-based

tariff, FERC imposes ongoing reporting requirements. A seller must file quarterly reports summarizing the contracts that it has entered into, even extremely short-term contracts. See *California ex rel. Lockyer* v. *FERC*, 383 F. 3d 1006, 1013 (CA9 2004). It must also demonstrate every four months that it still lacks or has adequately mitigated market power. See *ibid.* If FERC determines from these filings that a seller has reattained market power, it may revoke the authority prospectively. See Market-Based Rates, ¶5, 72 Fed. Reg. 39906. And if the Commission finds that a seller has violated its Regional Transmission Organization's market rules, its tariff, or Commission orders, the Commission may take appropriate remedial action, such as ordering refunds, requiring disgorgement of profits, and imposing civil penalties. See *ibid.*

Both the Ninth Circuit and the D. C. Circuit have generally approved FERC's scheme of market-based tariffs. See *Lockyer*, *supra*, at 1011–1013; *Louisiana Energy & Power Auth.* v. *FERC*, 141 F. 3d 364, 365 (CADC 1998). We have not hitherto approved, and express no opinion today, on the lawfulness of the market-based-tariff system, which is not one of the issues before us. It suffices for the present cases to recognize that when a seller files a market-based tariff, purchasers no longer have the option of buying electricity at a rate set by tariff and contracts no longer need to be filed with FERC (and subjected to its investigatory power) before going into effect.

C

California's Electricity Regulation and
Its Consequences

In 1996, California enacted Assembly Bill 1890 (AB 1890), which massively restructured the California electricity market. See 1996 Cal. Stat. ch. 854 (codified at Cal. Pub. Util. Code Ann. §§330–398.5 (West 2004 and Supp.

10    MORGAN STANLEY CAPITAL GROUP INC. *v.* PUBLIC
UTIL. DIST. NO. 1 OF SNOHOMISH CTY.

Opinion of the Court

2008)); see generally Cudahy, Whither Deregulation: A Look at the Portents, 58 N. Y. U. Annual Survey of Am. Law 155, 172–185 (2001) (hereinafter Cudahy). The bill transferred operational control of the transmission facilities of California's three largest investor-owned utilities to an Independent Service Operator (Cal-ISO). See *Pacific Gas & Elec. Co.* v. *FERC*, 464 F. 3d 861, 864 (CA9 2006). It also established the California Power Exchange (CalPX), a nonprofit entity that operated a short-term market—or "spot market"—for electricity. The bill required California's three largest investor-owned utilities to divest most of their electricity-generation facilities. It then required those utilities to purchase and sell the bulk of their electricity from and to the CalPX's spot market, permitting only limited leeway for them to enter into long-term contracts. See *Public Util. Dist. No. 1 of Snohomish Cty.* v. *FERC*, 471 F. 3d 1053, 1068 (CA9 2006) (case below).

In 1997, FERC approved the Cal-ISO as consistent with the requirements for an Independent Service Operator established in Order No. 888. FERC also approved the CalPX and the investor-owned utilities' authority to make sales at market-based rates in the CalPX, finding that, in light of the divesture of their generation units and other conditions imposed under the restructuring plan, those utilities had adequately mitigated their market power. See *Pacific Gas & Elec. Co.,* 81 FERC ¶61,122, pp. 61,435, 61,435–61,436, 61,537–61,548 (1997).

The CalPX opened for business in March 1998. In the summer of 1999, it expanded to include an auction for sales of electricity under "forward contracts"—contracts in which sellers promise to deliver electricity more than one day in the future (sometimes many years). But the participation of California's large investor-owned utilities in that forward market was limited because, as we have said, AB 1890 strictly capped the amount of power that they

could purchase outside of the spot market. See 471 F. 3d, at 1068.

That diminishment of the role of long-term contracts in the California electricity market turned out to be one of the seeds of an energy crisis. In the summer of 2000, the price of electricity in the CalPX's spot market jumped dramatically—more than fifteenfold. See *ibid.* The increase was the result of a combination of natural, economic, and regulatory factors: "flawed market rules; inadequate addition of generating facilities in the preceding years; a drop in available hydropower due to drought conditions; a rupture of a major pipeline supplying natural gas into California; strong growth in the economy and in electricity demand; unusually high temperatures; an increase in unplanned outages of extremely old generating facilities; and market manipulation." *CAlifornians for Renewable Energy, Inc.* v. *Sellers of Energy and Ancillary Servs.,* 119 FERC ¶61,058, pp. 61,243, 61,246 (2007). Because California's investor-owned utilities had for the most part been forbidden to obtain their power through long-term contracts, the turmoil in the spot market hit them hard. See Cudahy 174. The high prices led to rolling blackouts and saddled utilities with mounting debt.

In late 2000, the Commission took action. A central plank of its emergency effort was to eliminate the utilities' reliance on the CalPX's spot market and to shift their purchases to the forward market. To that end, FERC abolished the requirement that investor-owned utilities purchase and sell all power through the CalPX and encouraged them to enter into long-term contracts. See *San Diego Gas & Electric Co.* v. *Sellers of Energy and Ancillary Servs.,* 93 FERC ¶61,294, pp. 61,980, 61,982 (2000); see also 471 F. 3d, at 1069. The Commission also put price caps on wholesale electricity. See *San Diego Gas & Elec. Co.* v. *Sellers of Energy and Ancillary Servs.,* 95 FERC ¶61,418, p. 62,545 (2001). By June 2001, electricity prices

12    MORGAN STANLEY CAPITAL GROUP INC. *v.* PUBLIC
UTIL. DIST. NO. 1 OF SNOHOMISH CTY.

Opinion of the Court

began to decline to normal levels.  *Id.*, at 62,456.

## D
### Genesis of These Cases

The principal respondents in these cases are western utilities that purchased power under long-term contracts during that tumultuous period in 2000 and 2001.  Although they are not located in California, the high prices in California spilled over into other Western States.  See 471 F. 3d, at 1069.  Petitioners are the sellers that entered into the contracts with respondents.

The contracts between the parties included rates that were very high by historical standards.  For example, respondent Snohomish signed a 9-year contract to purchase electricity from petitioner Morgan Stanley at a rate of $105/megawatt hour (MWh), whereas prices in the Pacific Northwest have historically averaged $24/MWh.  The contract prices were substantially lower, however, than the prices that Snohomish would have paid in the spot market during the energy crisis, when prices peaked at $3,300/MWh.  See *id.,* at 1069–1070.

After the crisis had passed, buyer's remorse set in and respondents asked FERC to modify the contracts.  They contended that the rates in the contracts should not be presumed to be just and reasonable under *Mobile-Sierra* because, given the sellers' market-based tariffs, the contracts had never been initially approved by the Commission without the presumption.  See *Nevada Power Co.* v. *Enron Power Marketing, Inc.,* 103 FERC ¶61,353, pp. 62,382, 62,387 (2003).  Respondents also argued that contract modification was warranted even under the *Mobile-Sierra* presumption because the contract rates were so high that they violated the public interest.  See 103 FERC, at 62,383, 62,387–62,395.

In a preliminary order, the Commission instructed the Administrative Law Judge (ALJ) to consider 12 different

factors in deciding whether the presumption could be overcome for the contracts, such as the terms of the contracts, the available alternatives at the time of sale, the relationship of the rates to Commission benchmarks, the effect of the contracts on the financial health of the purchasers, and the impact of contract modification on national energy markets. After a hearing, the ALJ concluded that the *Mobile-Sierra* presumption should apply to the contracts and that the contracts did not seriously harm the public interest. In fact, according to the ALJ, even if the *Mobile-Sierra* presumption did not apply, respondents would not be entitled to have the contracts modified. 103 FERC, at 62,390–62,394.

Between the ALJ's decision and the Commission's ruling, the Commission's staff issued a report (Staff Report) concluding that unlawful activities of various sellers in the spot market had affected prices in the forward market. See *id.*, at 62,396. Respondents raised the report at oral argument before the Commission, and some of them argued that petitioners "were unlawfully manipulating market prices, thereby engaging in fraud and deception in violation of their market-based rate tariffs." *Ibid.* Petitioners contended, however, that the Staff Report demonstrated only a correlation between rates in the spot and forward markets, not a causal connection. See *ibid.*

FERC affirmed the ALJ. The Commission first held that the *Mobile-Sierra* presumption did apply to the contracts at issue. Although agreeing with respondents that the presumption applies only where FERC has had an initial opportunity to review a contract rate, the Commission relied on the somewhat metaphysical ground that the grant of market-based authority to petitioners qualified as that initial opportunity. See 103 FERC, at 62,388–62,389. The Commission then held that respondents could not overcome the *Mobile-Sierra* presumption. It recognized that the Staff Report had "found that spot market distor-

tions flowed through to forward power prices," 103 FERC, at 62,396–62,397, but concluded that this finding, even if true, was not "determinative" because:

> "a finding that the unjust and unreasonable spot market caused forward bilateral prices to be unjust and unreasonable would be relevant to contract modification only where there is a 'just and reasonable' standard of review. . . .  Under the 'public interest' standard, to justify contract modification it is not enough to show that forward prices became unjust and unreasonable due to the impact of spot market dysfunctions; it must be shown that the rates, terms and conditions are contrary to the public interest." *Id.*, at 62,397.

The Commission determined that under the factors identified in *Sierra*, as well as under a totality-of-the-circumstances test, respondents had not demonstrated that the contracts threatened the public interest.  See 103 FERC, at 62,397–62,399.  On rehearing, respondents reiterated their complaints, including their charge that "their contracts were the product of market manipulation by Enron, Morgan Stanley and other [sellers]."  105 FERC ¶61,185, pp. 61,979, 61,989 (2003).  The Commission answered that there was "no evidence to support a finding of market manipulation that specifically affected the contracts at issue."  *Ibid.*

Respondents filed petitions for review in the Ninth Circuit, which granted the petitions and remanded to the Commission, finding two flaws in the Commission's analysis.[2]  First, the court agreed with respondents that rates set by contract (whether pursuant to a market-based tariff

---

[2] In a holding not challenged before this Court, the Ninth Circuit concluded that the contracts at issue did not contain "*Memphis* clause[s]," 471 F. 3d 1053, 1079 (2006) (citing *United Gas Pipe Line Co.* v. *Memphis Light, Gas and Water Div.,* 358 U. S. 103 (1958)), see *supra*, at 5, that would have precluded application of the *Mobile-Sierra* presumption.

or not) are presumptively reasonable only where FERC has had an initial opportunity to review the contracts without applying the *Mobile-Sierra* presumption. To satisfy that prerequisite under the market-based tariff regime, the court said, the Commission must promptly review the terms of contracts after their formation and must modify those that do not appear to be just and reasonable when evaluated without the *Mobile-Sierra* presumption (rather than merely revoking market-based authority prospectively but leaving pre-existing contracts intact). See 471 F. 3d, at 1075–1077, 1079–1085. This initial review must include an inquiry into "the market conditions in which the contracts at issue were formed," and market "dysfunction" is a ground for finding a contract not to be just and reasonable. *Id.*, at 1085–1087. Second, the Ninth Circuit held that even assuming that the *Mobile-Sierra* presumption applied, the standard for overcoming that presumption is different for a *purchaser's* challenge to a contract, namely, whether the contract rate exceeds a "zone of reasonableness." 471 F. 3d, at 1088–1090.

We granted certiorari. See 551 U. S. \_\_\_ (2007).

## II

### A

### Application of *Mobile-Sierra* Presumption to Contracts Concluded under Market-Based Rate Authority

As noted earlier, the FERC order under review here agreed with the Ninth Circuit's premise that the Commission must have an initial opportunity to review a contract without the *Mobile-Sierra* presumption, but maintained that the authorization for market-based rate authority qualified as that initial review. Before this Court, however, FERC changes its tune, arguing that there is no such prerequisite—or at least that FERC could reasonably

16  MORGAN STANLEY CAPITAL GROUP INC. *v.* PUBLIC
UTIL. DIST. NO. 1 OF SNOHOMISH CTY.

Opinion of the Court

conclude so and therefore that *Chevron* deference is in order.  See Brief for FERC 20–21, 33–34; *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837 (1984).  We will not uphold a discretionary agency decision where the agency has offered a justification in court different from what it provided in its opinion.  See *SEC* v. *Chenery Corp.*, 318 U. S. 80, 94–95 (1943).  But FERC has lucked out: The *Chenery* doctrine has no application to these cases, because we conclude that the Commission was *required*, under our decision in *Sierra*, to apply the *Mobile-Sierra* presumption in its evaluation of the contracts here.  That it provided a different rationale for the necessary result is no cause for upsetting its ruling. "To remand would be an idle and useless formality.  *Chenery* does not require that we convert judicial review of agency action into a ping-pong game."  *NLRB* v. *Wyman-Gordon Co.*, 394 U. S. 759, 766–767, n. 6 (1969) (plurality opinion).

We are in broad agreement with the Ninth Circuit on a central premise: There is only one statutory standard for assessing wholesale electricity rates, whether set by contract or tariff—the just-and-reasonable standard.  The plain text of the FPA states that "[a]ll rates . . . shall be just and reasonable."  16 U. S. C. §824d(a); see also §824e(a) (2000 ed., Supp. V).  But we disagree with the Ninth Circuit's interpretation of *Sierra* as requiring (contrary to the statute) that the Commission apply the standard differently, depending on *when* a contract rate is challenged.  In the Ninth Circuit's view, *Sierra* was premised on the idea that "as long as the rate was just and reasonable when the contract was formed, there would be a presumption. . .that the reasonableness continued throughout the term of the contract."  471 F. 3d, at 1077.  In other words, so long as the Commission concludes (either after a hearing or by allowing a rate to go into effect) that a contract rate is just and reasonable when

initially filed, the rate will be presumed just and reasonable in future proceedings.

That is a misreading of *Sierra*. *Sierra* was grounded in the commonsense notion that "[i]n wholesale markets, the party charging the rate and the party charged [are] often sophisticated businesses enjoying presumptively equal bargaining power, who could be expected to negotiate a 'just and reasonable' rate as between the two of them." *Verizon*, 535 U. S., at 479. Therefore, only when the mutually agreed-upon contract rate seriously harms the consuming public may the Commission declare it not to be just and reasonable.[3] *Sierra* thus provided a definition of what it means for a rate to satisfy the just-and-reasonable standard in the contract context—a definition that applies regardless of when the contract is reviewed. The Ninth Circuit, by contrast, essentially read *Sierra* "as the equivalent of an estoppel doctrine," whereby an initial Commission opportunity for review prevents the Commission from modifying the rates absent serious future harm to the public interest. Tewksbury & Lim, Applying the *Mobile-Sierra* Doctrine to Market-Based Rate Contracts, 26 Energy L. J. 437, 457–458 (2005). But *Sierra* said nothing of the sort. And given that the Commission's passive permission for a rate to go into effect does not constitute a finding that the rate is just and reasonable, it would be odd to treat that initial "opportunity for review" as curtailing later challenges.

The Ninth Circuit found support for its prerequisite in our decision in *FPC* v. *Texaco Inc.*, 417 U. S. 380 (1974). In that case, we warned that the Commission's attempt to rely solely on market forces to evaluate rates charged by

––––––––

[3] We do not say, as the dissent alleges, *post*, at 7 (opinion of STEVENS, J.), that the public interest is not also relevant in a challenge to unilaterally set rates. But it is the "'sole concern'" in a contract case. See *FPC* v. *Sierra Pacific Power Co.*, 350 U. S. 348, 355 (1956).

18    MORGAN STANLEY CAPITAL GROUP INC. *v.* PUBLIC
UTIL. DIST. NO. 1 OF SNOHOMISH CTY.

Opinion of the Court

small natural-gas producers was inconsistent with the Natural Gas Act's insistence that rates be just and reasonable. See *id.*, at 397. The Ninth Circuit apparently took this to mean that all initially filed contracts must be subject to review without the *Mobile-Sierra* presumption. But *Texaco* had nothing to do with that doctrine. It held that the Commission had improperly implemented a scheme of *total deregulation* by applying no standard of review at all to small-producer rates. See 417 U. S., at 395–397. It did not cast doubt on the proposition that in a proper regulatory scheme, the ordinary mode for evaluating contractually set rates is to look to whether the rates seriously harm the public interest, not to whether they are unfair to one of the parties that voluntarily assented to the contract. Cf. *id.*, at 391, n. 4.

Nor do we agree with the Ninth Circuit that FERC must inquire into whether a contract was formed in an environment of market "dysfunction" before applying the *Mobile-Sierra* presumption. Markets are not perfect, and one of the reasons that parties enter into wholesale-power contracts is precisely to hedge against the volatility that market imperfections produce. That is why one of the Commission's responses to the energy crisis was to remove regulatory barriers to long-term contracts. It would be a perverse rule that rendered contracts less likely to be enforced when there is volatility in the market. (Such a rule would come into play, after all, *only* when a contract formed in a period of "dysfunction" did *not* significantly harm the consuming public, since contracts that seriously harm the public should be set aside even under the *Mobile-Sierra* presumption.) By enabling sophisticated parties who weathered market turmoil by entering long-term contracts to renounce those contracts once the storm has passed, the Ninth Circuit's holding would reduce the incentive to conclude such contracts in the future. Such a rule has no support in our case law and plainly under-

mines the role of contracts in the FPA's statutory scheme.

To be sure, FERC has ample authority to set aside a contract where there is unfair dealing at the contract formation stage—for instance, if it finds traditional grounds for the abrogation of the contract such as fraud or duress. See 103 FERC, at 62,399–62,400 ("[T]here is no evidence of unfairness, bad faith, or duress in the original negotiations"). In addition, if the "dysfunctional" market conditions under which the contract was formed were caused by illegal action of one of the parties, FERC should not apply the *Mobile-Sierra* presumption. See Part III, *infra*. But the mere fact that the market is imperfect, or even chaotic, is no reason to undermine the stabilizing force of contracts that the FPA embraced as an alternative to "purely tariff-based regulation." *Verizon*, 535 U. S., at 479. We may add that evaluating market "dysfunction" is a very difficult and highly speculative task—not one that the FPA would likely require the agency to engage in before holding sophisticated parties to their bargains.

We reiterate that we do not address the lawfulness of FERC's market-based-rates scheme, which assuredly has its critics. But any needed revision in that scheme is properly addressed in a challenge to the scheme itself, not through a disfigurement of the venerable *Mobile-Sierra* doctrine. We hold only that FERC may abrogate a valid contract only if it harms the public interest.

B

Application of "Excessive Burden"
Exception to High-Rate Challenges

We turn now to the Ninth Circuit's second holding: that a "zone of reasonableness" test should be used to evaluate a buyer's challenge that a rate is too high. In our view that fails to accord an adequate level of protection to contracts. The standard for a buyer's challenge must be the same, generally speaking, as the standard for a seller's

challenge: The contract rate must seriously harm the public interest.  That is the standard that the Commission applied in the proceedings below.

We are again in agreement with the Ninth Circuit on a starting premise: It is clear that the three factors we identified in *Sierra*—"where [a rate] might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory," 350 U. S., at 355—are not all precisely applicable to the high-rate challenge of a purchaser (where, for example, the relevant question is not whether "other customers" [of the utility] would be excessively burdened, but whether any customers of the purchaser would be); and that those three factors are in any event not the exclusive components of the public interest.  In its decision below, the Commission recognized both these realities.  See 103 FERC, at 62,397 ("Nevada Companies failed to show that the contract terms at issue impose an excessive burden *on their customers*" (emphasis added)); *id.*, at 62,398 ("The record also demonstrates that Snohomish presented no evidence that its contract with Morgan Stanley adversely affected Snohomish *or its ratepayers*" (emphasis added)); *id.*, at 62,398–62,399 (evaluating the "totality of circumstances"); see also Brief for FERC 41–42.[4]

Where we disagree with the Ninth Circuit is on the

————————

[4]The dissent criticizes the Commission's decision because it took into account under the heading "totality of the circumstances" only the circumstances of the contract formation, not "circumstances exogenous to contract negotiations, including natural disasters and market manipulation by entities not parties to the challenged contract." *Post*, at 13.  Those considerations are relevant to whether the contracts impose an "excessive burden" on consumers relative to what they would have paid absent the contracts.  It is precisely our uncertainty whether the Commission considered those "circumstances exogenous to contract negotiations," discussed in Part III of our opinion, that causes us to approve the remand to FERC.

overarching "zone of reasonableness" standard it established for evaluating a high-rate challenge and setting aside a contract rate: whether consumers' electricity bills "are higher than they would otherwise have been had the challenged contracts called for rates within the just and reasonable range," *i.e.,* rates that equal "marginal cost."[5] 471 F. 3d, at 1089. The Ninth Circuit derived this test from our statement in *Sierra* that a contract rate would have to be modified if it were so low that it imposed an "excessive burden" on other wholesale purchasers. The Ninth Circuit took "excessive burden" to mean merely the burden caused when one set of consumers is forced to pay above marginal cost to compensate for below-marginal-

—————

[5] Elsewhere the Ninth Circuit softened this standard somewhat, saying that "[e]ven if a particular rate exceeds marginal cost . . . it may still be within this reasonable range—or 'zone of reasonableness'—if that higher-than-cost-based price results from normal market forces and is part of a general trend toward rates that do reflect cost." 471 F. 3d, at 1089. We are not sure (and we think no one can be sure) precisely what this means. It has no basis in our opinions, and is in any event wrong because its point of departure (the general principle that rates cannot exceed marginal cost) contradicts *Mobile-Sierra.*

The Ninth Circuit purported to find support for its "zone of reasonableness" test in the case law of the District of Columbia Circuit. But the cited case stands only for the proposition that a market-based scheme must assure that market forces will, "over the long pull," cause rates to approximate marginal cost. *Interstate Natural Gas Assn. of Am.* v. *FERC*, 285 F. 3d 18, 31 (2002). Nowhere does the opinion suggest that the standard for reforming a particular contract validly entered into under a market-based scheme is whether the rates approximate marginal cost.

By the same token, our approval of FERC's decision not to set *prospective* area rates solely with reference to pre-existing contract prices, *Permian Basin Area Rate Cases*, 390 U. S. 747, 792–793 (1968), does not support, as the dissent thinks, *post*, at 8, n. 2, the view that the standard for abrogating an *existing*, valid contract is anything less than the *Mobile-Sierra* standard. *That* is the standard *Permian Basin* applied when actually confronted with the issue of contract modification. See 390 U. S., at 781–784, 821–822.

cost rates charged other consumers.   See 471 F. 3d, at
1088.  And it proceeded to apply a similar notion of "exces-
sive burden" to high-rate challenges (where all the burden
of the above-marginal-cost contract rate falls on the pur-
chaser's own customers, and does not affect the customers
of third parties).  *Id.,* at 1089.  That is a misreading of
*Sierra* and our later cases.  A presumption of validity that
disappears when the rate is above marginal cost is no
presumption of validity at all, but a reinstitution of cost-
based rather than contract-based regulation.   We have
said that, under the *Mobile-Sierra* presumption, setting
aside a contract rate requires a finding of "unequivocal
public necessity," *Permian Basin*, 390 U. S., at 822, or
"extraordinary circumstances," *Arkansas Louisiana Gas
Co.* v. *Hall*, 453 U. S. 571, 582 (1981).  In no way can these
descriptions be thought to refer to the mere exceeding of
marginal cost.

The Ninth Circuit's standard would give short shrift to
the important role of contracts in the FPA, as reflected in
our decision in *Sierra*, and would threaten to inject more
volatility into the electricity market by undermining a key
source of stability.   The FPA recognizes that contract
stability ultimately benefits consumers, even if short-term
rates for a subset of the public might be high by historical
standards—which is why it permits rates to be set by
contract and not just by tariff.  As the Commission has
recently put it, its "first and foremost duty is to protect
consumers from unjust and unreasonable rates; however,
. . . uncertainties regarding rate stability and contract
sanctity can have a chilling effect on investments and a
seller's willingness to enter into long-term contracts and
this, in turn, can harm customers in the long run."  Mar-
ket-Based Rates, ¶6, 72 Fed. Reg. 33906–33907.

Besides being wrong in principle, in its practical effect
the Ninth Circuit's rule would impose an onerous new
burden on the Commission, requiring it to calculate the

marginal cost of the power sold under a market-based contract. Assuming that FERC even ventured to undertake such an analysis, rather than reverting to the *ancien régime* of cost-of-service ratesetting, the regulatory costs would be enormous. We think that the FPA intended to reserve the Commission's contract-abrogation power for those extraordinary circumstances where the public will be severely harmed.[6]

## III
## Defects in FERC's Analysis Supporting Remand

Despite our significant disagreement with the Ninth

---

[6] The dissent claims that we have misread the FPA because its provisions "do not distinguish between rates set unilaterally by tariff and rates set bilaterally by contract." *Post*, at 2. But the dissent's interpretation, whatever plausibility it has as an original matter, cannot be squared with *Sierra*, which plainly distinguished between unilaterally and bilaterally set rates, and said that the only relevant consideration for the Commission in the latter case is whether the public interest is harmed. And the circumstances identified in *Sierra* as implicating the public interest refer to something more than a small dent in the consumer's pocket, which is why our subsequent cases have described the standard as a high one.

At the end of the day, the dissent simply argues against the settled understanding of the FPA that has prevailed in this Court, lower courts, and the Commission for half a century. Although the dissent is correct that we have never used the phrase "*Mobile-Sierra* doctrine" in our cases, that is probably because the understanding of it was so uniform that no circuit split concerning its meaning arose until the Ninth Circuit's erroneous decision in these cases. If one searches the Commission's reports, over 600 decisions since 2000 alone have cited the doctrine, see Brief for Electric Power Supply Association et al. as *Amici Curiae* 15, and the Courts of Appeals have used the term "*Mobile-Sierra* doctrine" (or "*Sierra-Mobile*" doctrine) over 75 times since 1974. If there were ever a context where long-settled understanding should be honored it is here, where a *statutory* decision (subject to revision by Congress) has been understood the same way for many years by lower courts, by this Court, by the federal agency the statute governs, and hence surely by the private actors trying to observe the law.

Circuit, we find two errors in the Commission's analysis, and we therefore affirm the judgment below on alternative grounds.

First, it appears, as the Ninth Circuit concluded, see 471 F. 3d, at 1090, that the Commission may have looked simply to whether consumers' rates increased immediately upon the relevant contracts' going into effect, rather than determining whether the contracts imposed an excessive burden on consumers "down the line," relative to the rates they could have obtained (but for the contracts) after elimination of the dysfunctional market. For example, the Commission concluded that two of the respondents would experience "rate decreases of approximately 20 percent for retail service" during the period covered by the contracts. 103 FERC, at 62,397. But the baseline for that computation was the rate they were paying before the contracts went into effect. That disparity is certainly a relevant consideration; but so is the disparity between the contract rate and the rates consumers would have paid (but for the contracts) further down the line, when the open market was no longer dysfunctional. That disparity, past a certain point, could amount to an "excessive burden." That is what was contemplated by *Sierra*, which involved a challenge 5 years into a 15-year contract. The "excessive burden" on other customers to which the opinion referred was assuredly the current burden, and not only the burden imposed at the very outset of the contract. See 350 U. S., at 355. The "unequivocal public necessity" that justifies overriding the *Mobile-Sierra* presumption does not disappear as a factor once the contract enters into force. Thus, FERC's analysis on this point was flawed—or at least incomplete. As the Ninth Circuit put it, "[i]t is entirely possible that rates had increased so high during the energy crises because of dysfunction in the spot market that, even with the acknowledged decrease in rates, consumers still paid more under the forward contracts

than they otherwise would have." 471 F. 3d, at 1090. If that is so, and if that increase is so great that, even taking into account the desirability of fostering market-stabilizing long-term contracts, the rates impose an excessive burden on consumers or otherwise seriously harm the public interest, the rates must be disallowed.

Second, respondents alleged before FERC that some of the petitioners in these cases had engaged in market manipulation in the spot market. See, *e.g.*, 105 FERC, at 61,989 ("Snohomish and Nevada Companies argue that their contracts were the product of market manipulation by Enron, Morgan Stanley and other Respondents, which, as established by the Commission Staff, engaged in market manipulation"). The Staff Report concluded, as we have said, that the abnormally high prices in the spot market during the energy crisis influenced the terms of contracts in the forward market. But the Commission dismissed the relevance of the Staff Report on the ground that it had not demonstrated that forward market prices were so high as to overcome the *Mobile-Sierra* presumption. We conclude, however, that if it is clear that one party to a contract engaged in such extensive unlawful market manipulation as to alter the playing field for contract negotiations, the Commission should not presume that the contract is just and reasonable. Like fraud and duress, unlawful market activity that directly affects contract negotiations eliminates the premise on which the *Mobile-Sierra* presumption rests: that the contract rates are the product of fair, arms-length negotiations. The mere fact that the unlawful activity occurred in a different (but related) market does not automatically establish that it had no effect upon the contract—especially given the Staff Report's (unsurprising) finding that high prices in the one market produced high prices in the other. We are unable to determine from the Commission's orders whether it found the evidence inadequate to support the claim that respondents' alleged unlawful activities af-

26    MORGAN STANLEY CAPITAL GROUP INC. *v.* PUBLIC
UTIL. DIST. NO. 1 OF SNOHOMISH CTY.

Opinion of the Court

fected the contracts at issue here. It said in its order on rehearing, 105 FERC, at 61,989, that "[w]e . . . found no evidence to support a finding of market manipulation [by respondents] that specifically affected the contracts at issue." But perhaps that must be read in light of the Commission's above described rejection of the Staff Report on the ground that high spot market prices caused by manipulation are irrelevant unless the forward market prices fail the *Mobile-Sierra* standard; and in light of the statement in its initial order, in apparent response to the claim of spot-market manipulation by respondents, 103 FERC, at 62,397, that "a finding that the unjust and unreasonable spot market prices caused forward bilateral prices to be unjust and unreasonable would be relevant to contract modification only where there is a 'just and reasonable' standard of review."

We emphasize that the mere fact of a party's engaging in unlawful activity in the spot market does not deprive its forward contracts of the benefit of the *Mobile-Sierra* presumption. There is no reason why FERC should be able to abrogate a contract on these grounds without finding a causal connection between unlawful activity and the contract rate. Where, however, causality has been established, the *Mobile-Sierra* presumption should not apply.

On remand, the Commission should amplify or clarify its findings on these two points. The judgment of the Court of Appeals is affirmed, and the cases are remanded for proceedings consistent with this opinion.

*It is so ordered.*

THE CHIEF JUSTICE and JUSTICE BREYER took no part in the consideration or decision of these cases.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 06–1457 and 06–1462

————

## MORGAN STANLEY CAPITAL GROUP INC., PETITIONER

06–1457                    *v.*

### PUBLIC UTILITY DISTRICT NO. 1 OF SNOHOMISH COUNTY, WASHINGTON, ET AL.

## AMERICAN ELECTRIC POWER SERVICE CORPORATION, ET AL., PETITIONERS

06–1462                    *v.*

### PUBLIC UTILITY DISTRICT NO. 1 OF SNOHOMISH COUNTY, WASHINGTON, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 26, 2008]

JUSTICE GINSBURG, concurring in part and concurring in the judgment.

Recommending denial of the petition for certiorari in these cases, the Federal Energy Regulatory Commission urged that review "would be premature" given "the inter-locutory nature of th[e] issues." Brief for Respondent Federal Energy Regulatory Commission in Opposition 22, 25. In this regard, the Commission called our attention to "new measures" it had taken, as well as recent enactments by Congress, bearing on "the evaluation of contracts under *Mobile-Sierra*." *Id.*, at 14–16. In view of these develop-ments, the Commission suggested, this Court should await "the better-developed record that would be produced by FER[C] . . . on remand." *Id.*, at 22. I agree that the Court would have been better informed had it awaited the Com-

mission's decision on remand.  I think it plain, however, that the Commission erred in the two respects identified by the Court.  See *ante*, at 24–26.  I therefore concur in the Court's judgment and join Part III of the Court's opinion.

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 06–1457 and 06–1462

———————

MORGAN STANLEY CAPITAL GROUP INC.,
PETITIONER

06–1457                    *v.*
PUBLIC UTILITY DISTRICT NO. 1 OF SNOHOMISH
COUNTY, WASHINGTON, ET AL.


AMERICAN ELECTRIC POWER SERVICE
CORPORATION, ET AL., PETITIONERS

06–1462                    *v.*
PUBLIC UTILITY DISTRICT NO. 1 OF SNOHOMISH
COUNTY, WASHINGTON, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 26, 2008]

JUSTICE STEVENS, with whom JUSTICE SOUTER joins, dissenting.

The basic question presented by these complicated cases is whether "the Federal Energy Regulatory Commission (FERC or Commission) must presume that the rate set out in a freely negotiated wholesale-energy contract meets the 'just and reasonable' requirement imposed by law." *Ante*, at 1. The opening sentence of the Court's opinion tells us that the "*Mobile-Sierra* doctrine"—a term that makes its first appearance in the United States Reports today—mandates an affirmative answer. This holding finds no support in either case that lends its name to the doctrine. Nevertheless, in the interest of guarding against "disfigurement of the venerable *Mobile-Sierra* doctrine," *ante*, at 19, the Court mangles both the governing statute and

precedent.

## I

Under the Federal Power Act (FPA), 41 Stat. 1063, 16 U. S. C. §791a *et seq.*, wholesale electricity prices are established in the first instance by public utilities, either via tariffs or in contracts with purchasers. §824d(c). Whether set by tariff or contract, all rates must be filed with the Commission. See *ibid.* Section 205(a) of the FPA provides, "All rates and charges . . . shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful." 16 U. S. C. §824d(a). Pursuant to §206(a), if FERC determines "that any rate . . . or that any rule, regulation, practice, or contract affect[ing] such rate . . . is unjust [or] unreasonable . . . , the Commission shall determine the just and reasonable rate, . . . rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order." 16 U. S. C. §824e(a). These provisions distinguish between the rate-setting roles of utilities (which initially set rates) and the Commission (which may override utility-set rates that are not just and reasonable), but they do not distinguish between rates set unilaterally by tariff and rates set bilaterally by contract. However the utility sets its prices, the standard of review is the same—rates must be just and reasonable.

The Court purports to acknowledge that "[t]here is only one statutory standard for assessing wholesale electricity rates, whether set by contract or tariff—the just-and-reasonable standard." *Ante*, at 16. Unlike rates set by tariff, however, the Court holds that any "freely negotiated" contract rate is presumptively just and reasonable unless it "seriously harms" the public interest. *Ante*, at 1. According to the Court, this presumption represents a "differing *application* of [the] just-and-reasonable standard," but not a different standard altogether. *Ante*, at 6.

I disagree. There is no significant difference between requiring a heightened showing to overcome an otherwise conclusive presumption and imposing a heightened standard of review. I agree that applying a separate standard of review to contract rates is "obviously indefensible," *ibid.*, but that is also true with respect to the Court's presumption.

Even if the "*Mobile-Sierra* presumption" were not tantamount to a separate standard, nothing in the statute mandates "differing *application*" of the statutory standard to rates set by contract. *Ibid.* Section 206(a) of the FPA provides, "without qualification or exception," that FERC may replace any unjust or unreasonable contract with a lawful contract. *Permian Basin Area Rate Cases*, 390 U. S. 747, 783–784 (1968) (construing identical language in the Natural Gas Act, 15 U. S. C. §717d(a)). The statute does not say anything about a mandatory presumption for contracts, much less define the burden of proof for overcoming it or delineate the circumstances for its nonapplication. Cf. *ante*, at 1, 19. Nor does the statute prohibit FERC from considering marginal cost when reviewing rates set by contract. Cf. *ante*, at 20–22, and n. 5.

If Congress had intended to impose such detailed constraints on the Commission's authority to review contract rates, it would have done so itself in the FPA. Congress instead used the general words "just and reasonable" because it wanted to give FERC, not the courts, wide latitude in setting policy. As we explained in *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843–844 (1984):

> "'The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.' *Morton* v. *Ruiz*, 415 U. S. 199, 231 (1974).

If Congress has explicitly left a gap for the agency to
fill, there is an express delegation of authority to the
agency to elucidate a specific provision of the statute
by regulation. Such legislative regulations are given
controlling weight unless they are arbitrary, capri-
cious, or manifestly contrary to the statute. Some-
times the legislative delegation to an agency on a par-
ticular question is implicit rather than explicit. In
such a case, a court may not substitute its own con-
struction of a statutory provision for a reasonable in-
terpretation made by the administrator of an agency."
(Footnote omitted.)

Consistent with this understanding of administrative
law, our cases interpreting the FPA have invariably "em-
phasized that courts are without authority to set aside any
rate adopted by the Commission which is within a 'zone of
reasonableness.'" *Permian Basin*, 390 U. S., at 797. But
see *ante*, at 19 (asserting that "a 'zone of reasonableness'
test . . . fails to accord an adequate level of protection to
contracts"). This deference makes eminent sense because
"rate-making agencies are not bound to the service of any
single regulatory formula; they are permitted, unless their
statutory authority otherwise plainly indicates, 'to make
the pragmatic adjustments which may be called for by
particular circumstances.'" *Permian Basin*, 390 U. S., at
776–777. Despite paying lipservice to this principle, see
*ante*, at 3, the Court binds the Commission to a rigid
formula of the Court's own making.

Having found no statutory text that supports its vision
of the *Mobile-Sierra* doctrine, the Court invokes the "im-
portant role of contracts in the FPA." *Ante*, at 22. But
contracts play an "important role" in the FPA only insofar
as the statute "departed from the scheme of purely tariff-
based regulation." *Verizon Communications Inc.* v. *FCC*,
535 U. S. 467, 479 (2002). In allowing parties to establish

rates by contract, Congress did not intend to immunize such rates from just-and-reasonable review. Both *United Gas Pipe Line Co.* v. *Mobile Gas Service Corp.*, 350 U. S. 332 (1956), and *FPC* v. *Sierra Pacific Power Co.*, 350 U. S. 348 (1956), the supposed progenitors of the "*Mobile-Sierra* presumption," make this point in no uncertain terms. See *Sierra*, 350 U. S., at 353 ("The Commission has undoubted power under §206(a) to prescribe a change in contract rates whenever it determines such rates to be unlawful"); *Mobile*, 350 U. S., at 344 ("[C]ontracts remain fully subject to the paramount power of the Commission to modify them when necessary in the public interest").[1] Accordingly, the fact that the FPA tolerates contracts does not make it subservient to contracts.

## II

Neither of the eponymous cases in the "*Mobile-Sierra* presumption," nor any of our subsequent decisions, substantiates the Court's atextual reading of §§205 and 206.

As the Court acknowledges, *Mobile* itself says nothing about what standard of review applies to rates established by contract. See *ante*, at 3–4. Rather, *Mobile* merely held that utilities cannot unilaterally abrogate contracts with purchasers by filing new rate schedules with the Commission. See 350 U. S., at 339–341. The Court neglects to mention, however, that although *Mobile* had no occasion to comment on the standard of review, it did imply that Congress would not have permitted parties to establish rates by contract but for "the protection of the public

---

[1] See also, *e.g.*, *Arkansas Louisiana Gas Co.* v. *Hall*, 453 U. S. 571, 582 (1981) *(Arkla)* ("[T]he clear purpose of the congressional scheme" for rate filing is to "gran[t] the Commission an opportunity in every case to judge the reasonableness of the rate"); *Permian Basin Area Rate Cases*, 390 U. S. 747, 784 (1968) ("[T]he Commission has plenary authority to limit or to proscribe contractual arrangements that contravene the relevant public interests").

6 MORGAN STANLEY CAPITAL GROUP INC. *v.* PUBLIC
UTIL. DIST. NO. 1 OF SNOHOMISH CTY.

STEVENS, J., dissenting

interest being afforded by supervision of the individual contracts, which to that end must be filed with the Commission and made public." *Id.*, at 339.

In *Sierra*, a public utility entered into a long-term contract to sell electricity "at a special low rate" in order to forestall potential competition. See 350 U. S., at 351–352. Several years later the utility complained that the rate provided too little profit and was therefore not "just and reasonable." The Commission agreed and set aside the rate "solely because it yield[ed] less than a fair return on the net invested capital." See *id.*, at 354–355. The Court vacated and remanded on the ground that the Commission had applied an erroneous standard. "[W]hile it may be that the Commission may not normally *impose* upon a public utility a rate which would produce less than a fair return," the Court reasoned, "it does not follow that the public utility may not itself agree by contract to a rate affording less than a fair return or that, if it does so, it is entitled to be relieved of its improvident bargain." *Id.*, at 355. When the seller has agreed to a rate that it later challenges as too low, "the sole concern of the Commission would seem to be whether the rate is so low as to adversely affect the public interest—as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory." *Ibid.* The Court further elaborated on what it meant by the "public interest":

"That the purpose of the power given the Commission by §206(a) is the protection of the public interest, as distinguished from the private interests of the utilities, is evidenced by the recital in §201 of the Act that the scheme of regulation imposed 'is necessary in the public interest.' When §206(a) is read in the light of this purpose, it is clear that a contract may not be said to be either 'unjust' or 'unreasonable' simply be-

cause it is unprofitable to the public utility." *Ibid.*

*Sierra* therefore held that, in accordance with the statement of policy in the FPA, 16 U. S. C. §824(a), whether a rate is "just and reasonable" is measured against the public interest, not the private interests of regulated sellers. Contrary to the opinion of the Court, see *ante*, at 23, n. 6, *Sierra* instructs that the public interest is the touchstone for just-and-reasonable review of *all* rates, not just contract rates. *Sierra* drew a distinction between the Commission's authority to *impose* low rates on utilities and its authority to *abrogate* low rates agreed to by utilities because these actions impact the public interest differently, not because the public interest governs rates set bilaterally but not rates set unilaterally. When the Commission imposes rates that afford less than a fair return, it compromises the public's interest in attracting necessary capital. The impact is different, however, if a utility has agreed to a low rate because investors recognize that the utility, not the regulator, is responsible for the unattractive rate of return.

*Sierra* used "public interest" as shorthand for the interest of consumers in paying "'the lowest possible reasonable rate consistent with the maintenance of adequate service in the public interest.'" *Permian Basin*, 390 U. S., at 793 (quoting *Atlantic Refining Co.* v. *Public Serv. Comm'n of N. Y.*, 360 U. S. 378, 388 (1959)). Whereas high rates directly implicate this interest, low rates do so only indirectly, such as when the rate is so low that it "might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory." *Sierra*, 350 U. S., at 355. Nothing in *Sierra* purports to mandate a "serious harm" standard of review, or to require any assumption that high rates and low rates impose symmetric burdens on the public interest. Cf. *ante*, at 19–20. As we

later explained in *FPC* v. *Texaco Inc.*, 417 U. S. 380, 399
(1974), the Commission cannot ignore even "a small dent
in the consumer's pocket" because "the Act makes unlaw-
ful all rates which are not just and reasonable, and does
not say a little unlawfulness is permitted."

Brushing aside the text of the FPA, as well as the hold-
ings in *Mobile* and *Sierra* themselves, the Court cherry
picks language from *Verizon*, *Arkla*, and *Permian Basin*.
Both *Verizon* and *Arkla* mentioned the *Mobile-Sierra* line
of cases only in passing, and neither case had anything to
do with just-and-reasonable review of rates. See *Verizon*,
535 U. S., at 479; *Arkla*, 453 U. S. 571, 582 (1981). Fur-
thermore, the statement in *Permian Basin* about "un-
equivocal public necessity," 390 U. S., at 822, speaks to the
difficulty of establishing injury to the public interest in the
context of a low-rate challenge, not a high-rate challenge.[2]

––––––––––

[2] The Court repeatedly quotes the following snippet from the 75-page
opinion in *Permian Basin:* "The regulatory system created by the Act is
premised on contractual agreements voluntarily devised by the regu-
lated companies; it contemplates abrogation of these agreements only
in circumstances of unequivocal public necessity." 390 U. S., at 822
(cited *ante*, at 5, 22, 24). Like *FPC* v. *Sierra Pacific Power Co.*, 350
U. S. 348 (1956), however, *Permian Basin* made this statement in the
course of rejecting a low-rate challenge. Read in context, the Court's
reference to "unequivocal public necessity" is a loose restatement of
*Sierra*, which required "evidence of injury to the public interest," and
which underscored how rarely a utility will be able to demonstrate that
a "contract price is so 'low as to adversely affect the public interest.'"
390 U. S., at 820–821 (quoting *Sierra*, 350 U. S., at 355). The Court's
expansive reading of the "unequivocal public necessity" statement
cannot be squared with *Permian Basin*'s discussion of the Commission's
authority to review rates set by contract: "Although the Natural Gas
Act is premised upon a continuing system of private contracting, the
Commission has plenary authority to limit or to proscribe contractual
arrangements that contravene the relevant public interests." 390 U. S.,
at 784 (citation omitted). Nor can it be reconciled with *Permian Basin*'s
rejection of the producers' arguments (1) that the Commission "wrongly
invalidated existing contracts" by imposing a ceiling on rates, see *id.*, at
781–784, and (2) that the Commission was compelled to adopt contract

The Court's reliance on these few stray sentences calls to mind our admonishment in *Permian Basin:* "The Commission's exercise of its regulatory authority must be assessed in light of its purposes and consequences, and not by references to isolated phrases from previous cases." *Id.*, at 791, n. 60.

## III

Lacking any grounding in the FPA or precedent, the Court concludes, as a matter of policy, that the *Mobile-Sierra* presumption is necessary to ensure stability in volatile energy markets and to reduce regulatory costs. See *ante*, at 22–23. Of course, "the desirability of fostering market-stabilizing long-term contracts," *ante*, at 25, plays into the public interest insofar as the "Commission's responsibilities include the protection of future, as well as present, consumer interests," *Permian Basin*, 390 U. S., at 798; see also *United Gas Pipe Line Co.* v. *Memphis Light, Gas and Water Div.*, 358 U. S. 103, 113 (1958) ("It seems plain that Congress . . . was not only expressing its conviction that the public interest requires the protection of consumers from excessive prices for natural gas, but was also manifesting its concern for the legitimate interests of natural gas companies in whose financial stability the gas-consuming public has a vital stake"). But under the FPA, Congress has charged FERC, not the courts, with balancing the short-term and long-term interests of consumers. See *Permian Basin*, 390 U. S., at 792 ("The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors").

Moreover, not even FERC has the authority to endorse the rule announced by the Court today. The FPA does not

---

prices as the basis for computing area rates, see *id.*, at 792–795.

10    MORGAN STANLEY CAPITAL GROUP INC. *v.* PUBLIC
UTIL. DIST. NO. 1 OF SNOHOMISH CTY.

STEVENS, J., dissenting

indulge, much less require, a "practically insurmountable" presumption, see *Papago Tribal Util. Auth.* v. *FERC*, 723 F. 2d 950, 954 (CADC 1983) (opinion for the court by Scalia, J.), that all rates set by contract comport with the public interest and are therefore just and reasonable. Congress enacted the FPA precisely because it concluded that regulation was necessary to protect consumers from deficient markets. It follows, then, that "the Commission lacks the authority to place exclusive reliance on market prices." *Texaco*, 417 U. S., at 400; see also *id.*, at 399 ("In subjecting producers to regulation because of anticompetitive conditions in the industry, Congress could not have assumed that 'just and reasonable' rates could conclusively be determined by reference to market price"). For this reason, we have already rejected the policy rationale proffered by the Court today:

> "It may be, as some economists have persuasively argued, that the assumptions of the 1930's about the competitive structure of the natural gas industry, if true then, are no longer true today. It may also be that control of prices in this industry, in a time of shortage, if such there be, is counterproductive to the interests of the consumer in increasing the production of natural gas. It is not the Court's role, however, to overturn congressional assumptions embedded into the framework of regulation established by the Act. This is a proper task for the Legislature where the public interest may be considered from the multifaceted points of view of the representational process." *Id.*, at 400 (footnote omitted).

Balancing the short-term and long-term interests of consumers entails difficult judgment calls, and to the extent FERC actually engages in this balancing, its reasoned determination is entitled to deference. But FERC cannot abdicate its statutory responsibility to ensure just

and reasonable rates through the expedient of a heavy-handed presumption. This is not to say that the Commission should abrogate any contract that increases rates, but to underscore that the agency is "obliged at each step of its regulatory process to assess the requirements of the broad public interests entrusted to its protection by Congress." *Permian Basin*, 390 U. S., at 791.

IV

Even if, as the Court holds today, the "*Mobile-Sierra* presumption" is merely a "differing *application*" of the statutory just-and-reasonable standard, FERC's orders must be set aside because they were not decided on this basis.

The FERC orders repeatedly aver that the agency is applying a "public interest" standard different from and distinctly more demanding than the statutory standard. See, *e.g.*, App. 1198a ("[T]he burden of showing that a contract is contrary to the public interest is a higher burden than showing that a contract is not just and reasonable. . . . The fact that a contract may be found to be unjust and unreasonable under [§§205 and 206] does not in and of itself demonstrate that the contract is contrary to the public interest under the Supreme Court cases"). Indeed, the Commission's misunderstanding of our cases is so egregious that the sellers, concerned that the orders would be overturned, asked the Commission for "clarification that the public interest standard of review does not authorize unjust and unreasonable rates." *Id.*, at 1506a, 1567a. FERC clarified as follows:

"[I]f rates . . . become unjust and unreasonable and the contract at issue is subject to the *Mobile-Sierra* standard of review, the Commission under court precedent may not change the contract simply because it is no longer just and reasonable. If parties' market-based rate contracts provide for the public interest

12    MORGAN STANLEY CAPITAL GROUP INC. *v.* PUBLIC
UTIL. DIST. NO. 1 OF SNOHOMISH CTY.

STEVENS, J., dissenting

standard of review, the Commission is bound to a higher burden to support modification of such contracts." *Id.*, at 1506a, 1567a.

Whereas in *Texaco* we faulted the Commission for failing to "expressly mention the just-and-reasonable standard," 417 U. S., at 396, in these cases FERC refused outright to apply that standard.[3]

In addition to misrepresenting FERC's understanding of the *Mobile-Sierra* doctrine as a presumption rather than a separate standard, the Court overstates the extent to which FERC considered the lawfulness of the rates. The Court recognizes, as it must, that the three factors identified in *Sierra* are neither exclusive nor "precisely applicable to the high-rate challenge of a purchaser." See *ante*, at 20; Brief for Respondent FERC 41–42. Although FERC applied what it termed the "*Sierra* Three-Prong Test," App. 1276a, the Court contends the agency did not err because it also evaluated the "'totality of the circumstances,'" see *ante*, at 20. But FERC's totality-of-the-circumstances review was infected by its misapprehension of the standard "dictated by the U. S. Supreme Court under the *Mobile-Sierra* doctrine." App. 1229a.

Whereas the focus of §§205(a) and 206(a) is on the reasonableness of the rates charged, not the conduct of the contracting parties, FERC restricted its review to the contracting parties' behavior around the time of formation. See *id.*, at 1280a–1284a. FERC seems to have thought it was powerless to conduct just-and-reasonable review unless the contract was already subject to abrogation

---

[3] The Court contends that FERC's application of the *Mobile-Sierra* doctrine "should be honored" because it represents the "settled understanding of the FPA." *Ante*, at 23, n. 6. As explained above, however, FERC's interpretation of the FPA (and of our cases construing the FPA) is "'obviously indefensible,'" *supra*, at 3 (quoting *ante*, at 6), and is therefore not entitled to any deference.

based on contract defenses such as fraud or duress. By including contracts within the scope of §206(a), however, Congress must have concluded that contract defenses are insufficient to protect the public interest. But see *ante*, at 19 (holding that the "*Mobile-Sierra* presumption" applies in all circumstances absent "traditional grounds for . . . abrogation" or "illegal action" by a contracting party).[4] Indeed, nothing in the FPA or this Court's cases precludes FERC from considering circumstances exogenous to contract negotiations, including natural disasters and market manipulation by entities not parties to the challenged contract.[5] FERC's error is obvious from the face of the orders, which repeatedly state the Commission's belief that it could not consider evidence relevant to the reasonableness of the contract rates.[6]

---

[4] The Court quite sensibly instructs FERC that "if it is clear that one party to a contract engaged in such extensive unlawful market manipulation as to alter the playing field for contract negotiations, the Commission should not presume that the contract is just and reasonable"; and that the "mere fact that the unlawful activity occurred in a different (but related) market does not automatically establish that it had no effect upon the contract—especially given the Staff Report's (unsurprising) finding that high prices in the one market produced high prices in the other." *Ante*, at 25. I disagree, however, with the Court's suggestion that the FPA restricts FERC's review of contract rates to these limited criteria.

[5] The FPA does not specify how market deficiencies should weigh in FERC's review of contract rates. Depending on the circumstances and how one balances the short-term and long-term interests of consumers, evidence of "market turmoil" may, as the Court argues, support rather detract from a finding that contract rates are just and reasonable. See *ante*, at 18. Whether any given contract rate "ultimately benefits consumers," *ante*, at 22, however, is a determination that Congress has vested in FERC, not this Court.

[6] See, *e.g.*, App. 1275a ("[A] finding that the unjust and unreasonable spot market prices caused forward bilateral prices to be unjust and unreasonable would be relevant to contract modification only where there is a 'just and reasonable' standard of review. As we have previously concluded, the contracts at issue in this proceeding do not provide

Although the Court and the Commission attempt to recast FERC's orders as applying the statutory standard, see *ante*, at 13–14; Brief for Respondent FERC 21, under the doctrine set forth in *SEC* v. *Chenery Corp.*, 318 U. S. 80 (1943), "we cannot accept appellate counsel's *post hoc* rationalizations for agency action; for an agency's order must be upheld, if at all, on the same basis articulated in the order by the agency itself," *Texaco*, 417 U. S., at 397 (internal quotation marks omitted). Furthermore, even assuming FERC subjectively believed that it was applying the just-and-reasonable standard despite its repeated declarations to the contrary, each order must be deemed "so ambiguous that it falls short of that standard of clarity that administrative orders must exhibit." *Id.*, at 395–396.

In order to get around the *Chenery* doctrine, the Court not only mischaracterizes FERC's orders, but also takes a more radical tack: It concludes that whatever the rationale set forth in FERC's orders, *Chenery* does not apply be- cause "the Commission was *required*, under our decision in *Sierra*, to apply the *Mobile-Sierra* presumption in its evaluation of the contracts here." *Ante*, at 16. This point prompts the Court to comment that "FERC has lucked out." *Ibid.* If the Commission has "lucked out," it is not only a purely fortuitous victory, but also a Pyrrhic one.

───────────

for such a standard but rather evidence an intent that the contracts may be changed only pursuant to the 'public interest' standard of review. Under the 'public interest' standard, to justify contract modifi- cation it is not enough to show that forward prices became unjust and unreasonable due to the impact of spot market dysfunctions" (footnote omitted)); *id.*, at 1527a ("Complainants were required to meet the public interest standard of review, not the just and reasonable standard of review which could have taken into account the causal connection between the spot market prices and forward bilateral market prices"); *id.*, at 1534a ("The Staff Report did not make any findings regarding the justness and reasonableness of any contract rates and any such findings would not be relevant here because the just and reasonable standard is not applicable").

Although FERC prevails in these cases despite having "offered a justification in court different from what it provided in its opinion," *ibid.*, it has paid a tremendous price. The Court has curtailed the agency's authority to interpret the terms "just and reasonable" and thereby substantially narrowed FERC's discretion to protect the public interest by the means it thinks best. Contrary to congressional intent, FERC no longer has the flexibility to adjust its review of contractual rates to account for changing conditions in the energy markets or among consumers. Cf. *Permian Basin*, 390 U. S., at 784 ("[A]dministrative authorities must be permitted, consistently with the obligations of due process, to adapt their rules and policies to the demands of changing circumstances").

## V

The decision of the Court of Appeals for the Ninth Circuit deserves praise for its efforts to bring the freewheeling *Mobile-Sierra* doctrine back in line with the FPA and this Court's cases. I cannot endorse the opinion in its entirety, however, because it verges into the same sort of improper policymaking that I have criticized in the Court's opinion. Both decisions would hobble the Commission, albeit from different sides. Congress has not authorized courts to prescribe energy policy by imposing presumptions or prerequisites, or by making marginal cost the sole concern or no concern at all. I would therefore vacate and remand the cases in order to give the Commission an opportunity to evaluate the contract rates in light of a proper understanding of its discretion.

I respectfully dissent.